**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      v.

JOSEPH M. TYSON,

           Defendant.

FILED

2007 AUG 22 PM 3:03

U.S. DISTRICT COURT
W.D. OF N.Y. ROCHESTER

REPORT AND
RECOMMENDATION
06-CR-6127

## Preliminary Statement

Currently before the Court are motions by defendant Joseph M. Tyson to suppress evidence found in his apartment as well as statements he made to the police. (Docket #19, 36).[1]   The Government filed papers in opposition to the motions. (Docket #20, 38, 39).  A suppression hearing was held on February 7, 2007 and February 27, 2007.  By Order of Judge Michael A. Telesca, dated July 17, 2006, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §636(b)(1)(A)-(B). (Docket #10).  The following is my Report and Recommendation as to the defendant's suppression motions.

## Factual Background

The testimony adduced at the suppression hearing revealed that on September 28, 2005, Detective James F. McLaughlin of the Keene,

---

[1]   Defendant Tyson also filed pro se motions to suppress. (Docket #31, 40) and the government responded. (Docket #43).  I have reviewed those motions and find that they do not raise new grounds for suppression, but rather present arguments and facts intended to supplement the legal grounds raised by counsel and addressed during the suppression hearing.  Accordingly, I will not write separately on Tyson's pro se motions to suppress.

New Hampshire Police Department participated in stopping Defendant Tyson's 1995 Dodge Caravan in a parking lot located in the Town of Keene.   See Transcript of February 7, 2007 Suppression Hearing [hereinafter "T1"] at 5-7 (Docket #28).   According to Detective McLaughlin, he obtained an arrest warrant for Tyson earlier in the day based on an internet investigation he conducted during the proceeding two weeks.[2]   During that investigation, McLaughlin, who portrayed himself as a fourteen year old boy from New Hampshire, exchanged sexually explicit instant messages with Tyson in an internet chat room.   T1 at 7; see also Government's Response, Exhibit A (Docket #20).   Tyson told McLaughlin that he would drive from his home in Canandaigua, New York to Keene, New Hampshire to meet McLaughlin for the purpose of engaging in sexual activities. Id.   Tyson described his van to McLaughlin and said he would arrive at their designated location (a parking lot near a closed restaurant in Keene) on September 28, 2005 at approximately 3:00 p.m.   Id.

When McLaughlin observed the van matching Tyson's description in the parking lot at the agreed upon time, McLaughlin stopped the van, handed Tyson the warrant and arrested him.   T1 at 7, 25.   A search of the van revealed, *inter alia,* a video camera, a jar of Vaseline, ten condoms, three battery-operated dildos, a bottle of

---

[2]   Defense counsel confirmed at the hearing that in light of the arrest warrant, he does not contest the legality of the initial stop of Tyson's van.   T1 at page 4.

lubricant and a mattress in the back of the van.  <u>See</u> Return of New Hampshire Warrant; Government's Exhibit 1 at page 17.

Later that day, McLaughlin interviewed Tyson at the Keene, New Hampshire police station.  T1 at 8.  The interview was memorialized with a digital recording device and was later transcribed by a stenographer.  T1 at 8-9, 27; Government's Exhibit 1.[3]  The interview transcript indicates that after obtaining Tyson's pedigree information, McLaughlin advised Tyson of his <u>Miranda</u> rights.  <u>See</u> Government's Exhibit 1 at page 4.  Tyson said that he understood his rights and signed a waiver of rights form.  <u>See</u> Government's Exhibit 2.[4]

Later, after Tyson's arrest was processed, McLaughlin asked him to sign a form giving consent for the police to search his home in Canandaigua, New York and seize "letters, papers, materials or other property and items."  McLaughlin also handwrote the phrase "CPU and electronic storage devices" on the form to indicate the focus of their search.  T1 at 19, 37-43, 51; <u>see</u> Government's Exhibit 3.  McLaughlin read the form to Tyson, including a statement advising him of his right to refuse his consent.  T1 at 43-47.  Tyson signed the form which acknowledged that "[t]his

---

[3]  McLaughlin testified that once the transcript was prepared, the recording was destroyed.  T1 at 9.

[4]  In addition to verbally advising Tyson of his <u>Miranda</u> rights, McLaughlin also provided Tyson with a written version, although Tyson told McLaughlin that he could not read the form because he did not have his eyeglasses.  T1 at 61; <u>see also</u> Government's Exhibit 1 at page 4.

consent to search has been given by me voluntarily and without threat, coercion or promise of favor." T1 at 53-54; Government's Exhibit 3. McLaughlin also told Tyson that "he could stop the search at any time." T1 at 47. After obtaining the signed consent form, McLaughlin called Detective Scott Lambert of the Canandaigua, New York Police Department to explain the circumstances surrounding Tyson's arrest in New Hampshire and faxed him the consent to search form Tyson had signed for his Canandaigua apartment. T1 at 48; <u>see also</u> Transcript of February 27, 2007 Suppression Hearing [hereinafter "T2"] at 4-7 (Docket #29).

Upon receiving the consent form, Detective Lambert went to Tyson's apartment complex and gained entrance to Tyson's apartment from the manager. T2 at 9, 46. Inside the apartment, the police observed a computer and printed directions to Keene, New Hampshire, as well as sex toys, pornographic magazines and videos. <u>See</u> Government's Response at page 2 (Docket #20); T2 at 9. Concerned that the New Hampshire consent form limited his search to the computer and computer related equipment only, Lambert decided to stop the search and attempt to obtain Tyson's consent on a form used by the Canandaigua Police Department. T2 at 8, 10, 47, 49. Lambert was unable to obtain Tyson's signature, so "[i]n an abundance of caution," he sought a search warrant to "widen[] the scope of the search." <u>See</u> Government's Response at pages 2-3, 6; T2 at 10, 49. Based on Detective Lambert's affidavit detailing the

results of the initial search of Tyson's home, Canandaigua City Court Judge Stephan Aronson signed the warrant on September 28, 2005 at 8:30 p.m.  <u>See</u> Government's Response, Exhibit B.  Once he had the search warrant, Lambert returned to Tyson's apartment, conducted the search and removed *inter alia,* Tyson's computer, discs and videos.  T2 at 50-51.

On October 11, 2005, Tyson returned from New Hampshire and went to the Canandaigua Police Station to obtain the key to his apartment.  T2 at 12, 54.[5]  Lambert told Tyson what the officers had removed from his apartment and Tyson "began to talk about possibly having child pornography on his computer."  T2 at 13.  According to Lambert, Tyson "started the conversation" and he was not in custody at that time.  T2 at 13.  Lambert asked Tyson if he could take a written statement and Tyson agreed.  T2 at 15, 81-82; <u>see</u> Government's Exhibit 6.  Prior to taking the statement, Lambert verbally advised Tyson of his <u>Miranda</u> rights, which are also listed on the department's voluntary statement sheet.  T2 at 17,20-22; Government's Exhibit 6.[6]  Once the statement was recorded, Tyson declined to sign the last three pages, believing that they could be misconstrued.  T2 at 21, 60.  After giving his statement, Tyson

---

[5]  Between the first and second searches of the apartment, Lambert had the lock on Tyson's apartment changed for security reasons. Thereafter, Lambert had the only key to Tyson's apartment.  T2 at 12-13.

[6]  Although Lambert believed that Tyson "possibly had a lawyer" in connection with the charges brought against him in New Hampshire, Lambert did not specifically tell Tyson he could contact that attorney.  T2 at 59-60.

left the police station and was not arrested on that day.   T2 at 90-91.

The next time Det. Lambert had contact with Tyson was on October 28, 2005.  On that day, Lambert called Tyson and asked him to come to the police department and collect some of his belongings that were not of any evidentiary value.  T2 at 22.[7]  Lambert also hoped to "try to speak to Mr. Tyson again [since] he was very willing to talk the first time."  T2 at 22, 63, 66.  Tyson arrived at the police station and retrieved his property and "started talking just like he did the first time . . . he started talking about how he feels or how he talks to young boys about sex, that he tries to educate them; he talks to them about oral sex and anal sex."  T2 at 26.  According to Lambert, he did not read Tyson his <u>Miranda</u> rights because he was not under arrest or in custody at that time.  T2 at 26.[8]  However, as Tyson spoke, he told Lambert about nude photographs he had taken of a nine year old boy from Webster, New York.  T2 at 27.  This admission caused Lambert to place Tyson under arrest.  T2 at 27-28.

After the arrest, Lambert read Tyson his <u>Miranda</u> rights, which

---

[7]  Lambert stated that although the police had discovered  what they believed to be child pornography on Tyson's computer, he did not intend to arrest Tyson that day because the photographs had not yet been certified by an expert.  T2 at 24.

[8]  According to Lambert, although he did not read Tyson his <u>Miranda</u> rights, he repeatedly told Tyson that he did not have to talk to him, that he could stop talking at any time and that he had the right to an attorney.  T2 at 27.

Tyson indicated he understood and initialed.   T2 at 31; see Government's Exhibit 7.   Lambert then questioned Tyson about his relationship with the nine year old boy and typed the questions and Tyson's responses onto a computer.   T2 at 32.   When the interview was over, Lambert printed the transcript and read it to Tyson.   Id. Lambert also gave Tyson an opportunity to read what he had typed and make any necessary changes.   T2 at 33.   Tyson signed the document.   Id.; Government's Exhibit 7.

Tyson eventually pled guilty to state criminal charges stemming from his Canandaigua arrest and was sentenced to a period of incarceration in New York State prison.   On March 23, 2006, Special Agent Douglas Soika of the FBI presented this Court with an application for an arrest warrant and criminal complaint setting forth federal charges against Tyson for his activities in the Fall of 2005.   See Docket #1.   Special Agent Jeffrey Kassouf of the FBI testified at the suppression hearing that he and Agent Soika went to the Elmira Correctional Facility to execute the arrest warrant and bring Tyson to federal court for his initial appearance.   T1 at 66.   Prior to transporting Tyson from the facility to federal district court, Agent Kassouf advised Tyson of his Miranda rights. T1 at 69-71.   Tyson stated that he understood his rights, initialed each line and signed the form.   T1 at 71-72; Government's Exhibit 4.   On the ride back to Rochester, Tyson and Agent Soika had an "in depth conversation" about Tyson's involvement in child pornography.

T1 at 91, 93.  Neither Agent Kassouf nor Agent Soika asked Tyson if he was represented by counsel.  T1 at 89.[9]

Tyson's Motion to Suppress:  In his supplemental motion papers, Tyson alleges that he did not give a valid consent to search his apartment on September 28, 2005 because it was "unknowing and involuntary."  Specifically, he claims that McLaughlin did not explain the constitutional right he was waiving by signing the form and that he was unable to read the form explaining the waiver because he did not have his glasses. Moreover, Tyson argues that there is no evidence that the handwritten insertion of "CPU and electronic storage devices" was included on the form when he signed it.  Therefore, Tyson claims that since the initial search of his apartment was conducted without a valid consent, probable cause or a search warrant, it was unlawful.

Tyson also argues that the search warrant which led to the second search of his apartment was based solely on evidence and information unlawfully obtained during the first search and therefore, without an independent and untainted source for the information contained in the search warrant application, the evidence seized as a result of that search warrant must be

---

[9]    According to the government, at that time, Tyson was not represented by counsel because he had pled guilty and had been sentenced on his New York State charges and there was no appeal pending.  See Government's Post Hearing Memorandum at page 19 (Docket #38).

suppressed.   Finally, Tyson claims that since the search warrant signed by Judge Aronson did not include the seizure of the entire apartment, Lambert unlawfully seized his apartment by changing the lock.

Tyson also claims that his statements to law enforcement should be suppressed.  With regard to his first statement given in New Hampshire to Det. McLaughlin on September 28, 2005, Tyson claims that Det. McLaughlin did not ensure that he understood his Miranda rights or waived them knowingly and voluntarily.   Tyson claims that his subsequent statements to Det. Lambert in Canandaigua must be suppressed as fruit of the poisonous tree because those statements are the direct result of the illegal search of his apartment.

Tyson further claims that his statement to Det. Lambert on October 11, 2005 was coerced because Tyson "was forced into cooperating with the detective in order to be able to enter his home."  See Defendant's Memorandum at page 18.   Tyson contends that Lambert obtained Tyson's statements on October 11, 2005 and October 28, 2005 in violation of his right to counsel because Lambert should have known that Tyson was already represented by counsel in his New Hampshire case.

Finally, Tyson claims that his March 29, 2006 statement to the FBI was obtained in violation of his Fifth and Sixth Amendment rights because he was already represented by counsel in New

Hampshire and he was not advised of the nature of the federal charges being brought against him.

## Discussion

Tyson's suppression motion raises distinct legal and factual issues that will addressed chronologically below.

**September 28, 2005 Search of Tyson's Canandaigua Apartment**:
It is well settled that unless a carefully defined exception clearly applies, a warrantless search is "per se unreasonable." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) citing Katz v. United States, 389 U.S. 347, 357 (1967).  One recognized exception to the warrant requirement is a search that is conducted pursuant to consent.  Schneckloth, 412 U.S. at 219.  "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search."  United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995)(citation omitted).   The prosecution bears the burden of proving that consent was voluntarily given. Schneckloth, 412 U.S. at 221-22.  The main inquiry is whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence to a show of authority." United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993).  In determining whether or not consent to a search was freely given, the Court must look at the totality of the circumstances surrounding the obtaining of the consent.  Schneckloth, 412 U.S. at

226.   Some factors to be considered are the age, education, intelligence and physical and mental condition of the defendant. United States v. Sanchez, 635 F.2d 47, 58 (2d Cir. 1980).  Although a defendant does not need to be advised of his right to refuse consent for a court to find it voluntary, whether a defendant was so advised is another factor the court may consider.  Schneckloth, 412 U.S. at 226-27.

Applying these legal principles to the facts adduced at the hearing, I find that Tyson gave his consent for the police to search his Canandaigua apartment knowingly and voluntarily.  First, I credit Detective McLaughlin's testimony that he read the entire consent form to Tyson, which includes a section advising him of his right to refuse consent and also informs him that anything recovered from his apartment could be used against him at trial. T1 at 43-47; see Government's Exhibit 3.  See also United States v. Chao Xian Yao, 2006 WL 1227771, *6 (S.D.N.Y. May 3, 2006)(where defendant signed consent form after being informed that he did not have to agree to any search, court found consent valid).  Given that Tyson was a 55 year old high school graduate, and McLaughlin's testimony that Tyson's demeanor was consistently calm and "in control" and he "didn't seem confused" (T1 at 22), I find that these factors weigh in favor of finding the consent to be voluntary.  See United States v. Sanchez, 635 F.2d at 60 (court found consent voluntary where women were "calm and relaxed").

Moreover, there is no evidence that the consent was in any way coerced.  McLaughlin testified that Tyson was not handcuffed when he was presented with the consent form and the fact that Tyson was in custody is insufficient in itself for a finding of coercion. See United States v. Crespo, 834 F.2d 267, 271 (2d. Cir. 1987)(that defendant was "under arrest and in custody, or even handcuffed" does not necessitate finding of coercion).  Notably, the form that Tyson signed includes an affirmation that his consent was given voluntarily "without threat, coercion or promise of favor."   See Government's Exhibit 3.  Thus, there is no evidence to suggest that this form was signed under duress.  See United States v. Chao Xian Yao, 2006 WL 1227771 at *6 (where signed form stated that defendant's consent was being given voluntarily, there was no basis for court to find it was coerced); United States v. Paracha, 2004 WL 1900336, *11 (S.D.N.Y. Aug. 24, 2004)(where defendant had signed consent to search form and there was "no basis for concluding that [officers] engaged in misconduct in seeking [defendant's] consent, court denied suppression motion).  Last, that Tyson may not have been able to read the form because he did not have his eyeglasses is not a barrier to consent because I credit McLaughlin's testimony that he read the form verbatim to Tyson prior to the defendant executing it.  See United States v. Chao Xian Yao, 2006 WL 1227771 at *6 (even though defendant could not read form because it was written in English, officer verbally translated it for him, and

12

therefore, his consent was valid).

As to the scope of the consent search, I find the fact that McLaughlin included the handwritten phrase "CPU and electronic storage devices" on the form not to be an explicit limitation on the scope of the search. Nevertheless, even if the notations were deemed to be a restriction, those limitations were eliminated when the officers suspended the consent search after their initial entry and obtained a valid search warrant. The scope of the warrant certainly authorized the seizure of the items set forth in the Government's Notice of Intent to Use (Docket #26). The search being lawful, Tyson's claim that the second search and his subsequent statements should be suppressed as the fruit of the poisonous tree must be rejected. See United States v. Villegas, 928 F.2d 512, 518 (2d Cir. 1991)(once court deemed defendant's consent valid, his motion to suppress his subsequent statements as fruit of the poisonous tree was denied).

Finally, I disagree with Tyson's claims that Lambert's decision to change the lock on his apartment constituted an unlawful seizure. I find credible Lambert's testimony that after suspending the initial consent search, he wanted the locks on the apartment changed in order to secure the premises while a search warrant was obtained. See Segura v. United States, 468 U.S. 796, 798 (1984)(when officers properly enter premises where occupant has been taken into custody, officers are entitled to secure the

premises "to preserve the status quo" while a warrant is obtained and such is not in violation of the Fourth Amendment's proscription against unreasonable seizures).   Lambert's efforts to secure the premises after the search was completed was also justified. Lambert knew that the defendant had been arrested in New Hampshire and the timing of his return to Western New York was uncertain.  He was unsure who had access to the apartment and was concerned that the police department may be liable for any loss pending Tyson's return from New Hampshire since the police had last access to the premises.   T2 at 86-87.   There is no evidence that Lambert or anyone else in law enforcement used the key to enter the premises after the search warrant was executed and no claim that Lambert refused to give the key back to Tyson when he did return to Canandaigua after being released from custody in New Hampshire. Accordingly, it is my Report and Recommendation that Tyson's motion to suppress the fruits of the search be denied.

**Tyson's September 28, 2005 Statements to Detective McLaughlin in New Hampshire**: There is no dispute that Tyson was subjected to custodial interrogation after he was arrested in New Hampshire and questioned by Detective McLaughlin.   "[A] person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in Miranda, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested."   Berkemer v. McCarty, 468 U.S. 420, 434

(1984).    Based  on  the  evidence  presented  at  the  suppression
hearing, I find that the government has met its burden in proving
that Tyson was advised of his <u>Miranda</u> rights, understood those
rights and then knowingly and voluntarily agreed to waive his
rights  and  speak  to  McLaughlin.    Specifically,  the  evidence
demonstrates that after being arrested, McLaughlin advised Tyson of
his <u>Miranda</u> rights, that Tyson stated he understood those rights
and then confirmed his willingness to speak by signing a waiver of
rights  form  prepared  by  McLaughlin.    There  is  no  evidence  of
coercion,  threats  or  trickery  which  would  have  improperly  or
unfairly induced  Tyson to sign the waiver form.   In sum, I find
that Tyson was properly advised of his rights and thereafter
voluntarily spoke with Detective McLaughlin.  Accordingly, it is my
Report  and  Recommendation  that  Tyson's  motion  to  suppress  the
statements he made on September 28, 2005 to Detective McLaughlin be
denied.

**Tyson's October 11, 2005 Statements to Detective Lambert in**
**Canandaigua:** It is only in the context of a custodial interrogation
that a defendant is entitled to be informed of his <u>Miranda</u> rights.
<u>Dickerson v. United States</u>, 530 U.S. 428, 434-35 (2000); <u>Tankleff</u>
<u>v. Senkowski</u>, 135 F.3d 235, 242-43 (2d Cir. 1998).   The Second
Circuit has held that <u>Miranda</u>'s "in custody" requirement is met if
questioning  was  "conducted  in  custodial  settings  that  have
inherently  coercive  pressures  that  tend  to  undermine  the

individual's will to resist and to compel him to speak." <u>United States v. Morales</u>, 834 F.2d 35, 38 (2d Cir. 1987).  In determining custodial status, a court should consider "whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest," and whether there were any "affirmative indications that the defendant was not free to leave." <u>United States v. Kirsh</u>, 54 F.3d 1062, 1067 (2d Cir. 1995)

Based on the evidence presented at the suppression hearing, I find that Tyson was not in custody when he was initially questioned by Detective Lambert on October 11, 2005.  Upon his return from New Hampshire, Tyson was informed that the keys to his apartment had been changed after the search was completed.  He drove to the police station to retrieve the new keys from Lambert.  Lambert testified that Tyson initiated a conversation with him in the police station and continued to speak despite being told by Lambert that he was under no obligation to do so.  Nevertheless, Tyson agreed to make a written statement and freely did so after Lambert read him his <u>Miranda</u> warnings.  Moreover, after reading the statement, Tyson felt comfortable enough to refuse to sign the last three pages of the statement because of his concern that his words could be "misconstrued."  After giving the statement, Tyson left the police station and returned to his apartment.  I find that a reasonable person would not have understood that he was "subjected

to restraints comparable to those associated with a formal arrest" and indeed Tyson was free and in fact did leave the police station after concluding his conversation with Lambert.   Hence, it is my Report and Recommendation that Tyson's motion to suppress his October 11, 2005 statements to Detective Lambert as being the unlawful product of custodial interrogation be denied.

Tyson also claims that because he had counsel on the New Hampshire charges, Detective Lambert violated his Sixth Amendment right to counsel when he questioned him on October 11, 2005 and again on October 28, 2005.   The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to have the Assistance of Counsel for his defense."   McNeil v. Wisconsin, 501 U.S. 171, 175 (1991)(citation omitted).   "The Sixth Amendment right, however, is offense specific" and "cannot be invoked once for all future prosecutions."   Id.   "The police have an interest in investigating new or additional crimes (after an individual is formally charged with one crime).   To exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained,  simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities."   McNeil at 175-76 quoting Maine v. Moulton, 474 U.S. 159, 179-180 (1985).   Thus, "the fact that the right has attached with respect to one offense does not

mean that it has attached with respect to another offense for which judicial proceedings have not yet been initiated." Teixeria v. Greiner, 205 F.Supp.2d 52, 56 (E.D.N.Y. 2002). See United States v. Mills, 412 F.3d 325, 329 (2d Cir. 2005)("the Sixth Amendment right to counsel does not extend to uncharged crimes unless they are the same offense as the charged crime").

Here, Tyson's Sixth Amendment right to counsel attached when he was charged and prosecuted in Keene, New Hampshire on September 28, 2005 with attempted sexual assault and using the internet to entice a minor to engage in illegal sexual activity. That right however was limited to those particular New Hampshire offenses and did not extend to statements he made to law enforcement regarding other crimes yet to be charged. Thus, the statements Tyson made to Lambert on October 11, 2005 regarding the child pornography on his home computer and the statements he made to Lambert on October 28, 2005 regarding his efforts to photograph and engage a nine year old boy in sexual relations were not the same offenses charged by the New Hampshire police. Therefore, any right to counsel that Tyson had with respect to his New Hampshire charges did not extend to the uncharged conduct that he subsequently discussed with Lambert. See United States v. Awan, 2006 WL 3207858, *6 (E.D.N.Y. Nov. 6, 2006)(even "[c]losely related conduct is not sufficient to carry over the right to counsel from one offense to another."). Accordingly, it is my Report and Recommendation that Tyson's Sixth

Amendment challenge to the statements he made on October 11, 2005 and October 28, 2005 be denied.

**Tyson's October 28, 2005 Statements to Detective Lambert in Canandaigua:** Tyson claims his October 28, 2005 statements to Detective Lambert were the product of custodial interrogation. Based on the suppression hearing testimony, I disagree. Tyson voluntarily went to the police station after Lambert told him certain property seized in the search of his residence was ready to be returned to him.   No specific appointment was made by Tyson and he simply appeared at the station on his own schedule.   T2 at 88-89.   There is no evidence in the record to support a finding that Lambert did or said anything on that occasion to coerce or compel Tyson to make incriminating statements.   Detective Lambert testified that after signing the property receipt, Tyson began "apologizing for all the trouble he caused" and a conversation ensued between Lambert and Tyson that resulted in Tyson making admissions that formed the basis for his immediate arrest.  Lambert testified he warned Tyson three times that he did not have to talk to him, but Tyson indicated he wanted to continue the conversation. Indeed, Lambert testified that he had no intention of arresting Tyson until Tyson made admissions about taking nude photographs of a nine year old boy from Webster, New York.   Put simply, the evidence does not support Tyson's claim that his arrest on October 28, 2005 was preceded by an unlawful custodial interrogation.   See

United States v. Aldeen, 2006 WL 2620635 (E.D.N.Y. Sept. 12, 2006)(where defendant went to police station voluntarily and told officers he "wanted to speak" about the child pornography he had downloaded to his computer to "straighten everything out" court found that he was not in custody for Miranda purposes).

After Tyson was arrested, Lambert did conduct a custodial interrogation of Tyson and obtained a written typed statement. The evidence at the suppression hearing, however, supports a finding that Tyson was given full Miranda warnings and thereafter agreed to continue talking to Lambert. After the questioning was completed, Tyson read and signed the typed statement, which was thereafter signed by Lambert and Sergeant Youngs. Again, there is no evidence of threats, coercion or intimidation in obtaining this statement. Since this post-arrest statement to law enforcement was made while Tyson was in custody, but after Miranda warnings were given, it is my Report and Recommendation that the typed signed statement should not be suppressed. See Nova v. Bartlett, 211 F.3d 705, 708 (2d Cir. 2000)(confession made post-Miranda admissible at trial).

**Tyson's March 29, 2006 Statements to the FBI:** Tyson argues that the statements he made to the FBI while being transported from state prison to the federal building for his initial appearance on the federal criminal complaint should be suppressed. Based on the evidence adduced at the suppression hearing, I find that Tyson's constitutional rights were not violated by the transporting agents.

There is no dispute that Tyson was in custody at the time of his transport to the federal building. However, the evidence at the hearing supports a finding that Tyson was properly informed of his <u>Miranda</u> rights, signed the advice of rights form and agreed to speak to the agents. Agent Kassouf testified that during the two hour ride to the federal building, Tyson spoke at length and without hesitation about his charges. The agents stopped at McDonalds and obtained lunch for the defendant and there is no evidence of coercion, threats or physical force used by the agents to induce Tyson to speak to them. Based on the foregoing, I find that Tyson's Fifth Amendment rights were not violated by the FBI agents who questioned Tyson on March 29, 2006.

During the hearing, the Court raised the issue of whether the defendant had Sixth Amendment rights that might be implicated by the law enforcement questioning of Tyson on March 29, 2006. "[W]aiver of the right to counsel under the sixth amendment is to be measured by a stricter standard that a similar waiver under the fifth amendment." <u>United States v. Smith</u>, 778 F.2d 925, 931 (2d Cir. 1985). In response, the government has agreed not to use any statements Tyson made about the New Hampshire charges during <u>any</u> law enforcement questioning conducted after criminal proceedings were commenced against Tyson in New Hampshire. As to whether Tyson had a Sixth Amendment right to counsel during the post-arrest transport from state prison to the federal building, the Second

Circuit has held that the filing of a federal criminal complaint does not give rise to a right to counsel immediately upon arrest pursuant to a warrant.  See United States v. Duvall, 537 F.2d 15, 22 (2d Cir. 1976)("We see no reason in principle why the filing of a complaint should be deemed to give rise to a right to counsel immediately upon arrest pursuant to a warrant").  See also United States v. Annucci, 2007 WL 1310156, *3 (S.D.N.Y. May 3, 2007)(where defendant's statements were made after his arrest but prior to being presented before a magistrate judge for arraignment court declined to apply Sixth Amendment protections).  Accordingly, it is my Report and Recommendation than Tyson's motion to suppress the statements made to the FBI on March 29, 2006 be denied.

### Conclusion

For the foregoing reasons, it is my Report and Recommendation that Tyson's motions to suppress be **denied.**

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: August _22_, 2007
       Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R. Civ.P. 72(b) and Local Rule 72.3(a)(3).[10]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated: August  22  2007
Rochester, New York

_____

[10]   Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. §3161(h)(1)(f) commences with the filing of this Report and Recommendation.   Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed.   <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).